**TERRI E. DICKENS  -  June 15, 2018**

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

Civil Action No.:8:16-cv-00803-JSM-TGW

_____

TERRI E. DICKENS, on behalf of the estate of

Ronnie E. Dickens and others similarly

situated,

                    Plaintiff,

v.

GC SERVICES LIMITED PARTNERSHIP,

                    Defendant.

_____


VIDEO
DEPOSITION OF:     (Terri E. Dickens)


DATE:              June 15, 2018

TIME:              10:43 a.m - 12:29 p.m.

PLACE TAKEN:       Lewis Brisbois Bisgaard & Smith
                   401 East Jackson Street
                   Suite 3400
                   Tampa, Florida 33602


REPORTED BY:       Dana L. Stockton, RPR
                   Notary Public
                   State of Florida, at Large

              PAGES 1 - 117

TERRI E. DICKENS  -  June 15, 2018

```
 1

 2   APPEARANCES:

 3           JAMES L. DAVIDSON, Esquire
             GREENWALD DAVIDSON RADBIL PLLC,
 4           5550 Glades Road, Suite 500,
             Boca Raton, FL 33486
 5             Appearing on behalf of
               the Plaintiffs
 6

 7           WILLIAM S. HELFAND, ESQ
             Lewis Brisbois Bisgaard & Smith LLP
 8           24 Greenway Plaza, Ste. 1400
              Houston, Texas 77046
 9             Appearing on behalf of
               the Defendant
10

11

12

13   ALSO PRESENT:

14           Videographer

15

16

17

18

19

20

21

22

23

24

25
```

**TERRI E. DICKENS  -  June 15, 2018**

```
 1                           INDEX

 2                                           PAGE

 3   TERRI E. DICKENS

 4   Direct Examination by Mr. Helfand        4

 5   CERTIFICATE OF OATH                     115

 6   CERTIFICATE OF REPORTER                 116

 7   ERRATA SHEET                            117

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**TERRI E. DICKENS - June 15, 2018**

1  the account, can we agree we're talking about the

2  Sam's Mastercard?

3       A.    Okay.

4       Q.    Okay.  In December of 2015 my client sent

5  a letter to your husband, Mr. Dickens.  Are you

6  aware of that?

7       A.    Yes.

8       Q.    Have you actually seen the letter?

9       A.    Yes.

10       Q.    When is the first time you saw the letter

11  that my client sent to Mr. Dickens in 2015?

12       A.    I don't know the date.

13       Q.    Okay.  Give me the year.

14       A.    I don't know the exact year.

15       Q.    Okay.

16       A.    It was probably, I would guess, some time

17  in late '15 or '16.

18       Q.    Okay.  Well, the letter was sent on

19  December 24th.  Let me see if -- of 2015.  Does that

20  help you remember when you first saw it?

21       A.    No.

22       Q.    Okay.  Who first showed you the letter?

23       A.    It was stuck on our refrigerator.

24       Q.    Okay.

25       A.    And I don't remember the date.

**TERRI E. DICKENS - June 15, 2018**

1  Q.   All right.   Who stuck it on -- and the

2  letter -- again, when I refer to letter, we're

3  talking about the letter of December 24th, 2015 from

4  my client, GC Services, to your husband.   Do you

5  understand what I mean by the letter?

6  A.   Yes.

7  Q.   Who stuck the letter on the refrigerator?

8  A.   I guess him.   I don't know.

9  Q.   Okay.   By the time you first saw the

10 letter, was it out of the envelope and on the

11 refrigerator?

12 A.   Yes.

13 Q.   Okay.   Did Mr. Dickens ever tell you why

14 he put the letter on the refrigerator?

15 A.   He had me take a picture of it, so I don't

16 know if he was -- you know, had to send it somewhere

17 or whatever, but he had me take a picture of it, so

18 that was why it was on the fridge.

19 Q.   Okay.   And that's what I would call the --

20 the rules require me to say, that's not responsive.

21 And it's not -- I'm not quarreling with you --

22 A.   Oh, I'm sorry.

23 Q.   Don't get me wrong.   But remember my

24 question was, did he ever tell you why he put it on

25 the fridge?

**TERRI E. DICKENS - June 15, 2018**

1  A.   No.

2  Q.   That's okay.  Again, that's one of those

3  objections that I have to make.  It's not a comment

4  on your -- but I just have to keep record -- track

5  of that.

6  Okay.  But you've answered my question.

7  Thank you.  How long did the letter stay on your

8  refrigerator?

9  A.   A couple days.

10  Q.   Okay.  And where did it go from there, the

11  letter?

12  A.   He put it into a file that he has.

13  Q.   Okay.  And do you have that file now?

14  A.   I have it at home.  Yes.

15  Q.   Okay.  At any time from either late 2015

16  or early 2016, up until the time he passed, did

17  Mr. Dickens ever tell you why he put that letter up

18  on the refrigerator?

19  A.   He gave me a few -- a little bit of

20  information, but not much.

21  Q.   Okay.  Tell me what he told you.

22  A.   He just told me that there was a case that

23  he was dealing with.  But I really didn't get much

24  more information than that.

25  Q.   Okay.  Did you say -- did I hear you

1  currently remember.  Did I say all that right?

2      A.    Correct.  Yes.

3      Q.    Okay.  And then if I get what you told me

4  correctly earlier, shortly after you took the

5  photograph and sent the e-mail at Mr. Dickens'

6  request, Mr. Dickens removed the photo -- the letter

7  from the refrigerator and put it into what you now

8  know is a file he kept?

9      A.    Yes.

10     Q.    Okay.  Is -- you now have the file that

11  contained the letter that Mr. Dickens received from

12  my client December of 2015, correct?

13     A.    Yes.

14     Q.    Is there anything else in the file other

15  than the letter?

16     A.    I glanced -- yes.

17     Q.    What else is in there?

18     A.    Just paperwork that he had that I found --

19  that's how I found out about Mr. Davidson.

20     Q.    Okay.  So there's some paperwork that

21  identifies Mr. Davidson somewhere in that file?

22     A.    Yes.

23     Q.    Okay.  And what else is in there, if

24  anything, in the file, that is?

25     A.    Just that and correspondence with

**TERRI E. DICKENS - June 15, 2018**

1  Mr. Davidson.

2      Q.   Okay.  So when you say just that, it's the

3  letter from my client --

4      A.   Yes.

5      Q.   -- right?

6      A.   The letter.

7      Q.   And then communications between

8  Mr. Dickens and his lawyer, Mr. Davidson?

9      A.   Yes.

10     Q.   Okay.  So in this file, see if I've got

11 this correct, that Mr. Dickens maintained prior to

12 his passing, there's the letter from my client and

13 some communications with his lawyer, Mr. Davidson?

14     A.   Yes.

15     Q.   Okay.  And I don't want to know specific

16 things that are in those communications, except I

17 want to understand the subject.  Don't tell me about

18 what anybody said on either side.

19          Are there communications something about

20 that letter, or are they about that letter and other

21 things, or are they completely about other things,

22 the communications with Mr. Davidson?

23          I gave you three choices.

24     A.   Yes.

25     Q.   Does that make sense?  Let's start with

**TERRI E. DICKENS - June 15, 2018**

1  this.  We'll just narrow it down.  Are there

2  communications in there between Mr. Davidson and

3  Mr. Dickens that talk about the letter?

4       A.   Yes.

5       Q.   Okay.  Are there communications in there

6  between Mr. Davidson and Mr. Dickens that don't talk

7  at all about the letter that we're here about?

8       A.   No.

9       Q.   Okay.  So all the communications between

10  Mr. Dickens and Mr. Davidson that are in the file

11  with my client's letter --

12       A.   Uh-huh.

13       Q.   -- are about my client's letter; is that

14  fair to say?

15       A.   Yes.

16       Q.   Okay.  I don't need to know anything more.

17  Thank you.  Anything more about that.  I need to

18  know a lot more but I can't really get into that.

19       A.   Okay.

20       Q.   Okay.  Other than the letter from my

21  client to Mr. Dickens and the communications between

22  Mr. Dickens and Mr. Davidson about my client's

23  letter to Mr. Dickens, do you have, have you seen or

24  are you aware of anything else in writing that talks

25  about my client's letter to Mr. Dickens?

**TERRI E. DICKENS - June 15, 2018**

1    Q.    Okay.  Does it harm anyone?

2    A.    It can.  Yes.

3    Q.    It could, right?

4    A.    Yes.

5    Q.    But in this case, did it harm Mr. Dickens?

6    A.    It violated his rights.  Yes.

7    Q.    His right to know that it has to be in

8  writing?

9    A.    Yes.

10    Q.    Okay.  But did Mr. Dickens suffer any loss

11  or injury as a result of not knowing whether he

12  needed to make a dispute in writing versus calling?

13         MR. DAVIDSON:  I'm going to object.  That

14      calls for a legal conclusion.

15  BY MR. HELFAND:

16    Q.    You can answer the question.

17    A.    You said loss or injury?

18    Q.    Right.  Did anything bad happen?  Did any

19  harm befall on Mr. Dickens?  Did he lose any money?

20  Did he lose anything of value?  Did anything happen

21  to Mr. Dickens that wouldn't have happened if the

22  letter had said, if you dispute this debt in

23  writing?

24    A.    Not for loss or injury.  No.

25    Q.    Okay.  But did anything change in

TERRI E. DICKENS - June 15, 2018

1  class action is based on the law, the law that was

2  broken.  And that's what I'm standing in -- you

3  know, standing in for him, because that's the action

4  suit, the class-action suit.

5      Q.   Okay.  I understand you can't answer my

6  question the way I asked it, so let me just object

7  to the statement as nonresponsive.  And based on

8  what you've told me, let me ask a couple of

9  different questions.

10     A.   Okay.

11     Q.   Do you know how many of the people to whom

12  the letter was mailed in Florida during the period

13  of time that your lawyers have inquired about, do

14  you know how many of them actually opened the

15  letter?

16     A.   No.

17     Q.   Do you know how many of them actually read

18  the letter?

19     A.   No.

20     Q.   Do you know how many of those people may

21  have wished to dispute the debt or any portion of

22  the debt listed in the letter that they received,

23  but we don't know if he even opened or read?

24     A.   No.

25     Q.   Do you know if any of those people wrote

1  to GC Services to dispute any portion or the total

2  debt listed in the letter they may have received?

3       A.    No.

4       Q.    Do you know whether any of those people

5  called or attempted to call GC Services to dispute

6  the validity of the debt or any portion of the debt

7  listed in the letter that they received?

8       A.    No.

9       Q.    If GC Services were to say to a judge or a

10 jury that you don't know of any harm that befell any

11 of those other people, as a result of being mailed

12 this letter, would that be correct or incorrect?

13      A.    It would be incorrect because I know

14 the -- what the class-action suit is for.

15      Q.    Well --

16      A.    I mean, that's what --

17      Q.    -- that's what you want to sue for.

18      A.    Yes.

19      Q.    But, okay.  So now you're suing, but then

20 the question is what do you know about what you're

21 suing about.  Here's the thing about lawsuits.

22 Anybody can file a lawsuit.  It doesn't mean just

23 because somebody filed a lawsuit that the law's been

24 broken or that somebody deserves to be compensated

25 for that.  It just means there's a complaint, a

TERRI E. DICKENS - June 15, 2018

1    complaint's been made.  Okay?  That's what they call

2    it, actually.  When you look at the front it says a

3    complaint.

4        A.   Yes.

5        Q.   Okay.  Now, not all complaints are valid,

6    we can agree on that, right?

7        A.   Right.

8        Q.   Okay.  And not all complaints are

9    accurate; can we agree on that?

10       A.   Yes.

11       Q.   Okay.  So the question is not just, I know

12   something happened because a lawsuit's been filed.

13   A lawsuit just has what we call allegations, that

14   is, complaints, right?

15       A.   Right.

16       Q.   Okay.  Now, I'm trying to dig into the

17   facts that would tell us whether the complaint is

18   accurate or not.  Okay.

19            So respectfully the answer can't be, well,

20   it's in my lawsuit because I'm asking you about

21   what's in your lawsuit about facts, and facts are

22   not necessarily the same thing as complaints or

23   allegations; does that make sense to you?

24       A.   Yes.

25       Q.   Okay.  So what I'm wondering is if -- are

**TERRI E. DICKENS - June 15, 2018**

1  you going to be able to tell the judge or a jury, if

2  there is one, of anything in anybody's life that

3  changed, was altered or was affected by receiving

4  the letter that we're here talking about?

5      A.   No.

6      Q.   And -- pardon me.  I'm sorry.  I thought

7  that was silenced.

8          And that would be true for Mr. Dickens, as

9  well, right?

10     A.   Yes.

11     Q.   Now, other than you believe -- and, again,

12 I'm not going to quarrel with your belief.  But

13 other than you believe that it's in violation of the

14 law, is there anything that actually hurt anybody by

15 my client offering more than one option to contact

16 them or by not limiting the option to contact them?

17         MR. DAVIDSON:  Objection.  Asked and

18     answered.

19         THE DEPONENT:  Can you repeat that?

20 BY MR. HELFAND:

21     Q.   Sure.  Other than that you think that it

22 violates the law --

23     A.   Uh-huh.

24     Q.   -- is there anything you're aware of that

25 hurt anybody, Mr. Dickens or anybody else, by my

**TERRI E. DICKENS - June 15, 2018**

1  client allowing more options to contact them other

2  than in writing?

3          MR. DAVIDSON:  Same objection.

4          THE DEPONENT:  Do I have to answer that?

5  BY MR. HELFAND:

6      Q.   Yes.  I'm afraid you do.

7      A.   I would say -- no.

8      Q.   Okay.  May I retrieve my copy of the

9  lawsuit, because that's going to give me information

10 on some other questions I need to ask.  All right.

11         You told me earlier that if you had an

12 issue with a business or a concern your first

13 inclination, if you had the information, would be to

14 call them; is that correct?

15     A.   Right.

16     Q.   Okay.  Do you have any information that

17 the other people that you propose to represent in

18 the class would have a different approach to solving

19 their problems if they had a concern with a

20 business, that is, that they might not want to make

21 a call first?

22     A.   No.

23     Q.   Okay.  I'm looking for something I know is

24 here, but I've got to find it.

25     A.   That's fine.

**TERRI E. DICKENS - June 15, 2018**

1  my client's letter, none of those people lost any

2  money, did they?

3          MR. DAVIDSON:  Objection --

4          THE DEPONENT:  They could have.

5          MR. DAVIDSON:  -- calls for speculation.

6  BY MR. HELFAND:

7      Q.   Right.  They could have.  Anything could

8  happen.  My question is, as the class representative

9  are you going to tell the judge and the jury that

10 anybody in the class lost any money because of my --

11 the way my client wrote their letter?

12     A.   No.

13     Q.   Because you're not aware of that, correct?

14     A.   Right.  I'm not aware of that.

15     Q.   In fact, Mr. Dickens was not out any money

16 because of the way my client wrote the letter,

17 correct?

18     A.   Correct.

19     Q.   So we don't need to give anybody any money

20 to compensate them for an actual financial loss; can

21 we agree on that?

22     A.   Yes.

23     Q.   We're not paying somebody back something

24 they lost, right?

25     A.   Not financially, no.  But --

**TERRI E. DICKENS - June 15, 2018**

1  to be there, right?

2      A.   Uh-huh.

3      Q.   As far as you know?

4      A.   Uh-huh.

5      Q.   Is that correct?

6      A.   Right.

7      Q.   Okay.  So whatever awareness they have

8  will probably come to them in some form of written

9  communication, like a letter, right?

10      A.   Right.

11      Q.   Okay.  You want them to be aware that

12  there was a right that they -- you think they had

13  that they didn't get, correct?

14      A.   Right.

15      Q.   We could tell them that in a letter,

16  right?

17      A.   Right.  But I'm looking out for their best

18  interest.

19      Q.   Okay.  Well -- but please tell me,

20  Mrs. Dickens, the goal here is not to give people

21  money just to give them money, it's to give them

22  money to compensate them, in my word of the

23  compensation, that is, to give them something back

24  for something they lost.  Is that what you're -- is

25  that your goal?

**TERRI E. DICKENS - June 15, 2018**

1    A.    Right.  But I don't know if these people

2    have been harmed.

3    Q.    Okay.

4    A.    And they need that money.

5    Q.    Okay.

6        MR. DAVIDSON:  I'm going to object.  It

7        calls for a legal conclusion to the prior

8        question.

9    BY MR. HELFAND:

10    Q.    And that's my point.  If you don't know

11    whether any of these people have been harmed, we

12    don't know what, if anything, would compensate them

13    for harm, correct?

14        MR. DAVIDSON:  Objection.  Calls for legal

15        conclusion.

16        THE DEPONENT:  Say that again.

17    BY MR. HELFAND:

18    Q.    Sure.  If we don't know whether anyone's

19    been harmed, then we don't know what would

20    compensate any one of them for any harm, correct?

21        MR. DAVIDSON:  Same objection.

22        THE DEPONENT:  Correct.  So that's why we

23        wouldn't -- we would still want them

24        compensated because we don't know that for

25        sure.

**TERRI E. DICKENS - June 15, 2018**

1    Q.   Okay.  So you see some impact -- that's

2  all right.

3        MR. HELFAND:  Let me object as

4     nonresponsive.

5  BY MR. HELFAND:

6    Q.   Paragraph 32 says, Plaintiff, that's you,

7  possesses the same interest and has suffered the

8  same injury as members of the proposed class.  What

9  injury has Mr. Dickens suffered?

10       MR. DAVIDSON:  Objection.  Asked and

11    answered.

12       THE DEPONENT:  His rights were violated.

13    He wasn't aware, that I know of.

14  BY MR. HELFAND:

15    Q.   He was given inaccurate information?

16    A.   Yes.

17    Q.   Any other injury that Mr. Dickens suffered

18  other than receiving a letter with what you believe

19  was inaccurate information?

20    A.   I don't know.

21       MR. DAVIDSON:  Objection.  Asked and

22    answered?

23       MR. HELFAND:  Did you get the answer?

24       THE COURT REPORTER:  Yes, sir.

25  BY MR. HELFAND:

**TERRI E. DICKENS - June 15, 2018**

1    Q.   Do you know of any class member who
2    suffered any injury?
3         MR. DAVIDSON:  Objection.  Asked and
4    answered.
5         THE DEPONENT:  I don't know.
6    BY MR. HELFAND:
7    Q.   Not that you know of?
8    A.   Not that I know of.  Yes.
9    Q.   Okay.  So do you have a means of showing
10   that Mr. Dickens' injury is the same as anyone else
11   in the class?
12   A.   The letter.
13   Q.   Just the letter?
14   A.   Yes.
15   Q.   Anything else?
16   A.   No.
17   Q.   Mrs. Dickens, may I rely upon all the
18   things you've told me here today?
19   A.   Yes.
20        MR. HELFAND:  All right.  I pass the
21   witness.  Thank you very much for your time.
22        MR. DAVIDSON:  And I don't have any
23   questions.  And we will read and sign.
24        VIDEOGRAPHER:  We're off the record at
25   12:29 p.m.(DEPOSITION CONCLUDED at 12:29 p.m.)

CERTIFICATE OF OATH

STATE OF FLORIDA   )

COUNTY OF HILLSBOROUGH    )

   I, Dana L. Stockton, RPR, the undersigned authority, certify that TERRI E. DICKENS, in this matter personally appeared before me and was duly sworn on the 15th day of June, 2018.

   WITNESS my hand and official seal this 19th day of June, 2018.

_____
Dana L. Stockton, RPR

**TERRI E. DICKENS  -  June 15, 2018**

```
1   STATE OF FLORIDA            )
    COUNTY OF HILLSBOROUGH       )
2

3

4   I, Dana L. Stockton, Registered Professional Reporter,
    certify that I was authorized to and did
5   stenographically report the foregoing deposition of
    TERRI E. DICKENS; that a review of the transcript is a
6   true and complete record of my stenographic notes.

7

8   I FURTHER CERTIFY that I am not a relative, employee,
    attorney or counsel of any of the parties, nor am I a
9   relative or employee of any of the parties' attorney or
    counsel connected with the action, nor am I financially
10  interested in this action.

11

12  Dated this 19th day of June, 2018.

13

14

15
    _____
16  Dana L. Stockton, RPR

17

18

19

20

21

22

23

24

25
```

**TERRI E. DICKENS  -  June 15, 2018**

1 PLEASE ATTACH TO THE DEPOSITION OF TERRI E. DICKENS

2 TAKEN JUNE 15, 2018 IN THE CASE OF TERRI E. DICKENS

3 VERSUS GC SERVICES LIMITED PARTNERSHIP

4 PAGE      LINE        CORRECTION THEREFOR

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19 I HAVE READ THE FOREGOING PAGES AND, EXCEPT FOR ANY

20 CORRECTIONS OR AMENDMENTS INDICATED ABOVE, I HEREBY

21 SUBSCRIBE TO THE ACCURACY OF THIS TRANSCRIPT.

22 _____        _____

23 TERRI E. DICKENS                      DATE

24 _____        _____

25 WITNESS TO SIGNATURE                  DATE